# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION
# CASE NO. 5:08-CV-00127

**MONTY KIM TURNER**                                                                 **PETITIONER**

**v.**

**JOSEPH MEKO, Warden**                                                              **RESPONDENT**

## MEMORANDUM OPINION AND ORDER

Before the Court is Monty Kim Turner's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254. On January 5, 2005, the petitioner, Monty Kim Turner, was convicted of possessing methamphetamine and drug-related contraband and for being a persistent felony offender for which he received a total prison term of twenty-five years. Before seeking federal habeas corpus relief, he unsuccessfully challenged his conviction and sentence on both direct appeal and collateral attack in the state court system. The matter was referred to United States Magistrate Judge W. David King for the resolution of all non-dispositive matters and for the preparation of a Report and Recommendation ("R & R") pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B). The Magistrate Judge's R & R to this Court (DN 15) is that Respondent's Motion to Dismiss be granted and the Petitioner's habeas corpus petition be denied. Petitioner has timely filed objections to the R & R (DN 16), to which the Respondent has not filed a reply. The matter is now ripe for consideration.

The Court has conducted a *de novo* review of the Magistrate Judge's R & R in light of the objections thereto and the record as a whole. As discussed more fully below, the Court adopts the Magistrate Judge's R & R on Claims Two through Seven, but declines to adopt the report in its entirety on Claim One, the issue of ineffective assistance of counsel for failure to adequately

investigate the alibi. Nonetheless, the outcome for Petitioner is the same. For the reasons that follow, Petitioner's 2254 Motion for Writ of Habeas Corpus is denied and the Respondent's Motion for Summary Judgment is granted

## BACKGROUND

A.      Procedural Background

On January 6, 2005, a McCracken Circuit Court jury convicted Petitioner Monty Kim Turner of unlawful possession of a methamphetamine precursor, complicity to possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, use/possession of drug paraphernalia, and being a persistent felony offender in the first degree. Petitioner was sentenced to a total of twenty-five years for these offenses. This sentence was affirmed on direct appeal by the Supreme Court of Kentucky in an unpublished decision (2005-SC-0289-MR). On April 13, 2007, Petitioner filed a motion to vacate the judgment and sentence pursuant to Kentucky Rule of Criminal Procedure 11.42, alleging ineffective assistance of counsel. On April 20, 2007, the trial court denied the motion without an evidentiary hearing. In a decision dated May 23, 2008, the Kentucky Court of Appeals affirmed the trial court's decision. *See Turner v. Com.*, No. 2007-CA-000964-MR, 2008 WL 2152264 (Ky. Ct. App. May 23, 2008). Petitioner did not seek discretionary review with the Kentucky Supreme Court. Petitioner now seeks federal habeas corpus relief in this court.

B.      Factual Background

The Supreme Court of Kentucky described the events leading up to Petitioner's arrest in its decision affirming his conviction:

On November 4, 2003, McCracken County Sheriff's Deputy Sgt. John Parks responded to a complaint of suspicious activity at [Petitioner's] residence. When Sgt. Parks arrived at the residence, he observed three men carrying duffle bags. The three men looked toward the officer when he shined his spotlight on them. A few seconds later, two of the men ran away in opposite directions. Sgt. Parks later identified [Petitioner] as one of the men who ran away. Michael Burgess, the only man who did not flee, also identified [Petitioner] as one of the individuals who was with him at the scene that night.

When deputies arrived at [Petitioner's] residence, three vehicles were parked in the driveway. Pursuant to a search warrant encompassing the residence, the vehicles, and the grounds, police recovered equipment and ingredients for manufacturing methamphetamine, including coffee filters, strainers, Liquid Fire, camp fuel, a folding stove, a cooking pan, containers and tubing, nineteen lithium batteries with the casings stripped off, 7.9 ounces of ground pseudoephedrine powder (approximately 11,095 pills), and a camouflage-painted fire extinguisher containing anhydrous ammonia. Police also found paraphernalia used to smoke both methamphetamine and marijuana, a Lorcen .380 semiautomatic pistol, a propane tank that had been retrofitted, an empty fire extinguisher canister that was identical to the one containing anhydrous ammonia, but with parts removed and unpainted, and a Wal-Mart receipt for the purchase of a coffee grinder, folding stove, plier set, siphon pump, poly spoons, and a CD case.

Using the Wal-Mart receipt, police obtained surveillance video that showed [Petitioner] and another co-defendant, Danny York, purchasing the items listed on the receipt just hours before they were confronted by Sgt. Parks. The surveillance video also showed Burgess accompanying [Petitioner] and York to the door, but not entering the store.

Three weeks later, [Petitioner] and York were arrested at another location. On the day of trial, Michael Burgess pled guilty to all charges against him without the benefit of a plea agreement. After entering his guilty plea, he was called by the Commonwealth to testify. Burgess stated that on the evening of November 3, 2003, he met [Petitioner] and York at [Petitioner's] residence. The trio went to Wal-Mart around 11:00 p.m. that evening and then returned to the residence. Just prior to Sgt. Parks' arrival in the early morning hours of November 4, 2003, the men were coming out of the residence and [Petitioner] was carrying a duffel bag. When Sgt. Parks shined his flashlight on them, [Petitioner] and York ran in opposite directions. Burgess denied having seen the container of anhydrous ammonia prior to trial, but said that he smelled it upon returning from Wal-Mart. He claimed that he merely drove [Petitioner] and York to Wal-Mart as a favor, and was not aware of the purpose of the trip.

3

> Both York and his girlfriend testified that he was not at the scene the night Sgt. Parks confronted the three men. York stated that he and [Petitioner] had been staying out-of-state after gun shots had been fired into [Petitioner's] residence. According to York, Burgess came to the out-of-state residence where [Petitioner] and York were staying. Although [Petitioner] and York were suspicious of Burgess as having been involved in the shooting of [Petitioner's] residence, York testified that they were friendly with Burgess in order to glean more details about the shooting. Burgess asked York and [Petitioner] if they would go to Wal-Mart and purchase some supplies for him as he could not go himself because he had recently been caught shoplifting at the store. York testified that he and [Petitioner] went with Burgess and purchased the supplies as part of their attempt to get information about the shooting. Burgess later returned [Petitioner] and York to the place where they were staying. York stated that he spent the rest of the night at the out-of-state residence and that [Petitioner] left with his sister.
>
> [Petitioner] absconded sometime during the trial. His attorney, nonetheless, called several witnesses on [Petitioner's] behalf. One witness, Roger Atkins, was [Petitioner's] neighbor and testified about the drive-by shooting at [Petitioner's] residence. According to Atkins, [Petitioner] told him after the shooting that he was going to Illinois. [Petitioner] asked Atkins to keep an eye on his residence while he was gone. On the night in question, Atkins testified that a vehicle approached too closely to his residence. When he looked out the window, he saw two unidentified skinheaded men on [Petitioner's] property. At this point, Atkins claimed that he called 911 to report the suspicious activity. However, the Commonwealth later introduced evidence indicating that a female called 911 that night to report suspicious activity. In rebuttal, Captain Hayden testified that Atkins called him repeatedly during the investigation because he was concerned about [Petitioner] having a methamphetamine lab right next door to him.
>
> [Petitioner's] sister and her friend testified that [Petitioner] was in Illinois the night Sgt. Parks confronted the three men at [Petitioner's] residence in Kentucky. They stated that [Petitioner] was staying with his sister because somebody shot into his residence.

*Turner v. Com.*, No. 2005-SC-0289, 2006 WL 1045411, at *1-2 (Ky. April 20, 2006).

## **STANDARD OF REVIEW**

Pursuant to statute, this Court's standard for reviewing a Magistrate Judge's R & R is as follows:

4

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. §636(b)(1); *see also* 28 U.S.C. foll. §2254, R. 10.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court shall not grant a habeas petition unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §2254(d).

The AEDPA further provides that state court determinations of fact are presumed to be correct. *Id.* at § 2254(e)(1).

The Supreme Court of the United States has taken care to distinguish federal habeas review from review on direct appeal, particularly when the state court articulates the correct legal rule in its review of a claim. In this situation a "federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). A federal habeas court also may not substitute its evaluation of the state evidentiary record for that of the state trial court unless the state determination is unreasonable. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree . . . but on habeas review that does not suffice to supercede the trial court's credibility determination.").

# ANALYSIS

Petitioner moves the Court to reconsider seven claims of ineffective assistance of counsel that were previously considered by the state trial and appellate court. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Id.* (citing *Strickland*, 466 U.S. at 688). To establish prejudice, a petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

FAILURE TO INVESTIGATE ALIBI

The Magistrate Judge in this case thoroughly reviewed the record and prepared a carefully reasoned R & R to this Court that finds no merit to the Petitioner's seven claims of ineffective assistance of counsel. The Court has carefully reviewed the Petitioner's objections to the Magistrate Judge's R & R. And though not required to do so, the Court has also reviewed the videos of the trial and post-trial proceedings. At trial, Petitioner's co-defendant York, York's girlfriend, and Petitioner's sister, Tonya McKendree, provided alibi testimony. They testified that Petitioner was at McKendree's residence in Pope County, Illinois, and not with Burgess in Kentucky, on the night in question (the evening of November 3, 2003 through the morning of November 4, 2003, hereinafter referred to as November 3/4, 2003). Petitioner's sister McKendree testified that she could not recall the exact date, but she knew that Petitioner had stayed at her home in Pope County, Illinois the evening before she saw Petitioner and York on the *Fugitive Files* (a segment on the local television station news) the following day:

6

Cross-examination by Commonwealth Attorney:

Q: Okay. But on one occasion you brought Danny York and Monty Turner from Pope County to Paducah, is that right?

A: That's correct.

Q: But you don't know what date that was.

A: Don't know a certain date. I know I seen 'em on Fugitive Files the following day, whatever date that was. I . . . .

Q: So the day after you brought them to Paducah, they were on the Fugitive Files?

A: Correct.

Q: You're sure about that?

A: Much as I can be, yeah.[1]

In rebuttal, Captain Hayden subsequently testified that *Fugitive Files* always aired on Thursday nights, and in this case it would have aired on Thursday, November 6, 2003. Captain Hayden's testimony thus dated Tonya McKendree's alibi testimony for the evening of November 5, not November 3. Petitioner asserts that his counsel botched the alibi by establishing it on the wrong evening. This issue is further complicated by the fact that, following a post-trial hearing, it was determined by the state trial court that *Fugitive Files* actually airs on Wednesdays, and thus could not have aired on Thursday, November 6, 2003, as Captain Hayden originally testified. Upon this discovery, counsel for Petitioner moved for a judgment notwithstanding the verdict, but the motion was ultimately denied.

---

[1] Court's own transcription of Tonya McKendree's testimony.

Petitioner argues that counsel "botched the alibi" because an adequate investigation would have revealed that McKendree, in fact, saw a clip from the Channel Six *Noon News* on November 4, 2003, reporting that her brother and York fled on foot from a crime scene the evening before. Petitioner argues that had counsel adequately prepared by investigating the date and programming with the local news station, he would have known McKendree meant she saw a news segment on the *Noon News*, not *Fugitive Files*. He argues that counsel could have then corrected the record, thus providing the jury with a plausible alibi that he was at his sister's home on the night of November 3/4, 2003.

Attached to his Objections to the Magistrate Judge's Report and Recommendation (DN 16), Petitioner has supplied the Court with documentation supporting his alibi arguments. Based upon this Court's review of the state appellate records, it appears that these documents were included in support of Petitioner's 11.42 Motion to the trial court. Included as Exhibit D-1 is a letter dated August 10, 2006 from Bill Evans, the Vice President of News and Operations for WPSD News Channel Six, forwarding television records to Petitioner; Exhibit D-2/3 is a two-page Press Release from Captain John Hayden of the McCracken County Sheriff's Department dated November 4, 2003 identifying two suspects who fled on foot from a drug-related investigation at 12:33 AM on 11/04/03 as 41 year old Monte Kim Turner and 39 year old Danny W. York; Exhibit D-6 is the Midday News Rundown for Tuesday, November 04, 2003; Exhibit D-9/10 is the news script for the Midday News segment that aired on November 4, 2003; Exhibit C-1 is a two page Affidavit dated December 17, 2006 from Tonya McKendree; and C-2 is a one page written statement dated July 26, 2004 from Tonya McKendree.

In his R & R, the Magistrate Judge concludes that Petitioner "failed to present any probative evidence that the Noon News that aired on Wednesday, November 5, 2003, in fact, mentioned

8

Petitioner and York." The Court finds that this determination by the Magistrate Judge is factually in error because the *Noon News* at issue herein allegedly aired on Tuesday, November 4, 2003, not Wednesday, November 5, 2003. And though the documents were not contained in the record before the Magistrate Judge, Petitioner has provided in his Objection to the R & R evidence from News Channel Six that – if it had been discovered/developed by defense counsel – could have bolstered McKendree's alibi testimony. Or at the very least, this information could have saved some confusion at trial.

In a perfect trial scenario for Petitioner, counsel for Petitioner would have gone over Ms. McKendree's alibi testimony before trial, and attempted to pin it down to a specific date with corresponding records from News Channel Six. We know that such corroborating records did exist, as Petitioner was able to obtain them. Consistent with her original affidavit (Exhibit C-2), McKendree would have testified that Petitioner was at her home in Golconda, Pope County, Illinois on the evening of November 3, 2003. When asked how she remembered that date, she could have confirmed that it was the night before she saw the segment about him on the *Noon News* on November 4, 2003. Testimony from a News Channel Six representative could have been introduced as corroboration of the date. McKendree would not have confused seeing her brother as a fugitive on the *Noon News* story with *Fugitive Files*. More importantly, there would have been no rebuttal testimony about when *Fugitive Files* airs – erroneous or otherwise – from Captain Hayden.

Under the ideal circumstances described above, the McKendree alibi could have been found plausible by the jury. It is noteworthy that the jury did request to review Ms. McKendree's testimony during its deliberations. The Magistrate Judge asserts that evidence pertaining to the dates and contents of a television program is peripheral and insignificant at best. Similarly, the Kentucky Supreme Court and Court of Appeals noted that the evidence "did nothing to strengthen the weight

9

of [the] sister's testimony and there was no decisive value or force to it." Certainly, the News Channel Six records in and of themselves do not establish Petitioner's alibi. However, had the information been developed and presented, there would have been no opportunity for the devastating rebuttal of Petitioner's sister's alibi testimony by Captain Hayden of the McCracken County Sheriff's Department.

Nonetheless, the Court does agree with the Magistrate Judge that Petitioner has failed to show a reasonable probability that the jury would have credited the bolstered alibi testimony over the eye-witness testimony. In addition to the testimony of York, York's girlfriend, and McKendree, the jury weighed the contrary testimony of Sgt. Parks and Burgess that Petitioner was, in fact, with Burgess in Kentucky on the night of November 3 and early morning of November 4, 2003. In addition, there was also the Wal-Mart video surveillance placing Petitioner in Paducah on the evening in question. Even if McKendree's alibi testimony had been dated to November 3/4, 2003, the testimony of Sgt. Parks and Burgess provided sufficient evidence for the jury to conclude that Petitioner was in fact in Kentucky, and not in Illinois with his sister on that evening. Under the applicable standard, Petitioner simply cannot show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

## CONCLUSION

For the reasons discussed above, the Court adopts the Magistrate Judge's R & R in all respects, excepting the analysis under Count One. Respondent's Motion to Dismiss is **GRANTED** and the Petition for Writ of Habeas Corpus is **DENIED.**

An appropriate Order shall issue.